## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

FEDERAL BUREAU OF INVESTIGATION
AGENTS ASSOCIATION;
JOHN DOE 1;
JOHN DOE 2;
JOHN DOE 3;
JOHN DOE 4; and
JANE DOE 1;
JANE DOE 2; and
JANE DOE 3.

　　　　　　　　　　Plaintiffs,

　　　　　　　v.

U.S. DEPARTMENT OF JUSTICE and
THE UNITED STATES OF AMERICA,

　　　　　　　　　　Defendant.

Case No. _____

## COMPLAINT

Plaintiffs the Federal Bureau of Investigation Agents Association ("FBIAA"), by and through their attorneys, and John Does 1 through 4 and Jane Does 1 through 3 (the "Doe Plaintiffs"), collectively, the "Plaintiffs," by and through their attorneys, hereby bring this Complaint against the Defendants United States Department of Justice and United States of America. In support thereof, upon personal knowledge as well as information and belief, Plaintiffs allege the following:

### NATURE OF THE ACTION

Plaintiffs consist of longtime current special agents and other personnel employed at the Federal Bureau of Investigation ("FBI"). They have brought this case to remedy Defendants' unlawful retaliation for their pursuit of lawful and appropriately commenced cases and

investigations in their capacity while employed with the FBI regarding the attacks on the U.S. Capitol on January 6, 2021.

Plaintiffs seek this Court's protection from Defendants' anticipated retaliatory decision to expose their personal information for opprobrium and potential vigilante action by those who they were investigating.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the Constitution and laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1361 because Plaintiffs seek a writ of mandamus to compel officers and employees of the United States and its agencies to perform duties owed to Plaintiff and required under law.

2. Sovereign immunity for non-monetary relief is waived under 5 U.S.C. § 702, which entitles Plaintiffs to relief when Defendants acted unconstitutionally and beyond statutory authority.

3. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) and (e).

## PARTIES

4. FBIAA is a non-profit professional organization dedicated to the service of FBI agents. Its mission is to advocate for the careers, economic interests, conditions of employment, and welfare of its members. Its membership includes both current and former Special Agents. FBIAA has approximately 14,000 members.  The FBI employs approximately 13,800 Special Agents. Approximately 12,000 of the FBI's 13,800 Special Agents are members of FBIAA.

5. The Doe Plaintiffs include Special Agents, forensic examiners, a forensic chemist, and an intelligence analyst. Each are currently employed by the FBI.

2

6.  Defendant, the United States Department of Justice, is a Cabinet agency within the executive branch of the United States government and controls its subordinate component FBI, which employs the Plaintiffs.

7.  Defendant, the United States of America, is responsible for the exercise of state action being challenged by Plaintiffs in this case.

## FACTS

8.  FBI employees are regularly called upon to undertake some of the most critical and high-stakes law enforcement investigations in our nation. They work at the direction of senior leaders at the Department of Justice to investigate and help prosecute complex crimes, often against sophisticated and powerful adversaries.

9.  The FBI's mission is as diverse as it is sensitive. FBI Special Agents have among the broadest of investigative authorities and are frequently the lead investigators on cases involving counterterrorism, fentanyl trafficking, child pornography, cybercrime, and other critical threats. FBI agents are empowered by law to conduct investigations of and to make arrests for offenses enumerated in the United States Code.

10. The targets of their investigations often have many tools of their own at their disposal that can be used to interfere with the FBI's work or to endanger its agents.

11. On any given day, an FBI agent may be face-to-face with an individual who would sooner resort to violence than submit to the law. FBI agents, including those among the FBIAA Plaintiffs, have worked undercover using pseudonyms in order to operate within an investigation.

12. Other employees of the FBI, for example, certain of the Doe Plaintiffs, are not Special Agents but support investigations in other ways like computer or intelligence analysis and forensic examination.

**A.   January 6, 2021**

13.   The events of January 6, 2021, and the activities leading up to the violence that ensued on the U.S. Capitol on that day, have been well documented by courts in this circuit.  Specifically, "[o]n January 6, 2021, a mob professing support for then-President Trump violently attacked the United States Capitol in an effort to prevent a Joint Session of Congress from certifying the electoral college votes designating Joseph R. Biden the 46th President of the United States. The rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol.  Then-Vice President Pence, Senators, and Representatives were all forced to halt their constitutional duties and flee the House and Senate chambers for safety." *Trump v. Thompson*, 20 F.4th 10, at 15-16 (D.C. Cir. 2021).

14. Following the November 3, 2020 presidential election in which "Americans elected Joseph Biden as President, giving him 306 electoral college votes[,] [t]hen-President Trump . . . refused to concede, claiming that the election was 'rigged.'" *Trump v. Thompson*, 20 F.4th at *18 (quoting President Donald J. Trump, Statement on 2020 Election Results at 0:34-0:46, 18:11-18:15, C-SPAN (Dec. 2, 2020), https://www.c-span.org/video/?506975-1/president-trump-statement-2020-election-results).  In the ensuing weeks following the 2020 election, "President Trump and his allies filed a series of lawsuits challenging the results of the election," and "[t]he courts rejected every one of the substantive claims of voter fraud that was raised."  *Id.* (citing *Donald J. Trump for President, Inc. v. Secretary of Pennsylvania*, 830 F. App'x 377, 381 (3d Cir. 2020) ("[C]alling an election unfair does not make it so. Charges require specific allegations and then proof. We

have neither here.") (additional citations omitted).

15. On January 6, 2021, Congress proceeded in its solemn Constitutional duty "[a]s required by the Twelfth Amendment to the Constitution and the Electoral Count Act," and "a Joint Session of Congress convened on January 6, 2021 to certify the results of the election." *Id.* (citing 3 U.S.C. § 15; 167 Cong. Rec. H75-H85 (daily ed. Jan. 6, 2021)). In advance of the Constitutionally-mandated certification of the electoral votes, "President Trump had sent out a Tweet encouraging his followers to gather for a '[b]ig protest in D.C. on January 6th' and to '[b]e there, will be wild!'" *Id.* (quoting Donald Trump (@realDonaldTrump), Twitter (Dec. 19, 2020, 1:42 AM).

16. On January 6, 2020, "[s]hortly before noon . . . President Trump took the stage at a rally of his supporters on the Ellipse, just south of the White House," where he gave a speech "reiterat[ing] his claims that the election was 'rigged' and 'stolen,' and urged then-Vice President Pence, who would preside over the certification, to 'do the right thing' by rejecting various States' electoral votes and refusing to certify the election in favor of Mr. Biden." *Id.* at 18-19 (quoting Donald J. Trump, Rally on Electoral College Vote Certification at 3:33:05-3:33:10, 3:33:32-3:33:54, 3:37:19-3:37:29, C-SPAN (Jan. 6, 2021), https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification ("January 6 Speech")). Nearing "the end of the speech, President Trump announced to his supporters "we're going to walk down Pennsylvania Avenue * * * to the Capitol and * * * we're going to try and give our Republicans * * * the kind of pride and boldness that they need to take back our country." *Id*. (quoting January 6 Speech at 4:42:00-4:42:32). President Trump "[u]rg[ed] the crowd to 'demand that Congress do the right thing and only count the electors who have been lawfully slated[,]' he warned that 'you'll never take back our country with weakness' and declared '[w]e fight like hell and if you don't fight like hell, you're not going to have a country anymore.'" *Id.* (quoting January 6 Speech Id. at 3:47:20-3:47:42,

4:41:17-4:41:33).

17. Thereafter, "[s]hortly after the speech, a large crowd of President Trump's supporters—including some armed with weapons and wearing full tactical gear—marched to the Capitol and violently broke into the building to try and prevent Congress's certification of the election results." *Id.*  Violence ensued.  "The mob quickly overwhelmed law enforcement and scaled walls, smashed through barricades, and shattered windows to gain access to the interior of the Capitol.  Police officers were attacked with chemical agents, beaten with flag poles and frozen water bottles, and crushed between doors and throngs of rioters."  *Id.* at 18 (citations omitted).

18. "As rioters poured into the building, members of the House and Senate, as well as Vice President Pence, were hurriedly evacuated from the House and Senate chambers.  Soon after, rioters breached the Senate chamber. In the House chamber, Capitol Police officers barricaded the door with furniture and drew their weapons to hold off rioters.  Some members of the mob built a hangman's gallows on the lawn of the Capitol, amid calls from the crowd to hang Vice President Pence."  *Id.* (quotation marks and citations omitted); *see also United States v. Alford*, 89 F. 4th 943 (D.C. Cir. 2024) ("That afternoon, however, a mob broke through the perimeter, tore down the barricades and clashed with police. Members of the mob entered the Capitol through broken windows and then threw open the doors to their compatriots. Ultimately, the mob delayed the electoral certification by several hours. Both the Senate and the House recessed shortly after 2:00 p.m. and did not resume until 8:00 p.m. that night after law enforcement secured the building.").

19. "The events of January 6, 2021 marked the most significant assault on the Capitol since the War of 1812.  The building was desecrated, blood was shed, and several individuals lost their lives. Approximately 140 law enforcement officers were injured, and one officer who had been attacked died the next day. In the aftermath, workers labored to sweep up broken glass, wipe away

blood, and clean feces off the walls. Portions of the building's historic architecture were damaged or destroyed." *Thompson*, 20 F.4th at 19.

### C. Federal Law Enforcement Investigations and Prosecutions in the Aftermath of January 6

20. Following the events of January 6, 2021, the FBI and Department of Justice began investigating the myriad federal crimes seemingly committed, pursuant to the missions of their respective law enforcement agencies. In fact, federal law enforcement mobilized that very day to assist in quelling the riots, bringing order to the Capitol, and seeking out those who broke the law.

21. Investigative efforts were centralized out of the District of Columbia federal district ("DDC"). Functionally, this meant that FBI agents swore out arrest warrant affidavits in front of DDC magistrate judges. Upon receipt and review of the sworn affidavit, DDC magistrate judges approved the FBI's arrest warrant applications and provided a signed, lawful arrest warrant to the arresting FBI agent or FBI task force officer (local law enforcement detailed to the FBI) for execution.

22. In some instances, individuals were arrested pursuant to a grand jury indictment. In these cases, FBI agents testified in front of a federal grand jury under Fed. R. Crim P. 6. If the grand jury found probable cause based on the evidence presented, a supervising court would then issue a lawful arrest warrant for execution

23. Many of the perpetrators of the January 6 riots fled Washington, D.C., immediately after the carnage. Because of this, the FBI had to coordinate efforts across the country in order to amass evidence. This frequently entailed applying for search warrants under Fed. R. Crim. P. 41 in the district where the evidence was to be located. Again, the FBI applied for warrants via sworn affidavits presented to neutral and detached magistrate judges. In the context of search warrants for physical property (e.g., phones, clothes, stolen property), these lawful warrants were issued by

a multitude of magistrate judges outside of DDC.

24.  On November 18, 2022, then-Attorney General Merrick Garland appointed Jack Smith as a Special Counsel to investigate matters relating to the events of January 6, 2021.  *See In re Sealed Case*, 77 F. 4th 815 (D.C. Cir. 2023).  Even prior to that appointment, however, federal law enforcement investigated and prosecuted over 1,500 individuals in connection with the events of January 6, 2021.  All told, the Department of Justice charged nearly 1,600 individuals with crimes from the attack.  *See*  https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories (last visited February 4, 2025).

25. In the ensuing years, President Trump repeatedly referred to the defendants in the cases arising from the events of January 6, 2021 as "hostages."  *See, e.g.*, https://truthsocial.com/@realDonaldTrump/posts/112210383255858788    (with    audio    of incarcerated January 6 defendants) (last visited February 4, 2025); Emma Barnet and Jillian Frankel, *Trump says there will be a "bloodbath" if he loses the election*, NBC News (March 16, 2024) (discussing his comments at a 2024 rally referring to January 6 prisoners as "hostages"), https://www.nbcnews.com/politics/donald-trump/trump-bloodbath-loses-election-2024-rcna143746 (last visited February 4, 2025).

26. Trump has also repeatedly and publicly attempted to portray the FBI not as law enforcement investigators but as "[t]hugs", "[t]yrants," and "Gestapo."  *See* https://truthsocial.com/@realDonaldTrump/posts/109745175533954622 (last visited February 4, 2025) *and* https://truthsocial.com/@realDonaldTrump/posts/109529028482982758 (last visited February 4, 2025).

29. He has also been a prolific promulgator of conspiracy theories in an attempt to redefine the events of January 6.  *See* Alyssa Meiman, *Trump has spread conspiracy theories about January*

*6th more than 175 times on Truth Social*, CREW (June 6, 2024), https://www.citizensforethics.org/reports-investigations/crew-investigations/trump-has-spread-conspiracy-theories-about-january-6th-more-than-175-times-on-truth-social/ (last visited February 4, 2025).

### D. Actions Since January 20, 2025

30. During his inauguration speech on January 20, 2025, Trump once again referenced his perceived "weaponization" of federal law enforcement, stating "The vicious, violent and unfair weaponization of the Justice Department and our government will end." *See* https://www.whitehouse.gov/remarks/2025/01/the-inaugural-address/ (last visited February 4, 2025).

31. One of President Trump's first actions following his inauguration was pardoning or commuting the sentences of every single person prosecuted by the Department of Justice for conduct related to January 6, 2021. Proclamation, "Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021" (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/granting-pardons-and-commutation-of-sentences-for-certain-offenses-relating-to-the-events-at-or-near-the-united-states-capitol-on-january-6-2021/.

32. Since receiving their presidential pardons or commutations, the leaders of the January 6 riot and others have tagged FBI agents who worked on the investigation and prosecutions of those rioters.

33. For example, on February 1, 2025, a leader of the violent Proud Boys gang publicly posted the following on social media:



@NobleOne,          X,          (February          1,          2025,          5:14          PM),

https://x.com/NobleOne/status/1885889389160513818) (last visited February 4, 2025).

34. Originally sentenced to 22 years in prison, Enrique Tarrio has been recently released from federal custody and has openly expressed his intent to seek retaliation against the FBI. In his X bio line, he claims to be the "United States Secretary of Retaliation."

35. Mr. Tarrio has also threatened that "[t]he people who did this, they need to feel the heat, they need to be put behind bars, and they need to be prosecuted…. Success is going to be retribution." Rachel Leingang, *Proud Boys leader thanks Trump for January 6 pardon and vows revenge*, The Guardian (Jan. 24, 2025), https://www.theguardian.com/us-news/2025/jan/24/trump-pardon-proud-boys-enrique-tarrio (last visited February 4, 2025).

36. As of the date of this affidavit, multiple hashtags are trending on X that allow January 6 convicts-turned-pardons to link to each other in posts promoting violence and insurrection against law enforcement agents. For example, the below user @magashredguitar ("Steve"), whose bio claims he was a "J6 attendee," re-posted the following post from another January 6 convict-turned-pardon recipient Chris Quaglin (@CQuaglin) which apparently depicts Mr. Quaglin's FBI interview subsequent to his arrest in 2021.  On February 3, 2024, Steve captioned his re-post "This FBIer better have filled out that survey today asking about his J6 prosecution (persecution) involvement."



37.   For context, according to the Department of Justice, Quaglin was ultimately sentenced to 12 years in prison before being pardoned by President Trump.  The Department of Justice described that on January 6, 2021, Quaglin, dressed in a hard-sided helmet, full-faced gas mask, and carrying a backpack and bear spray (chemical irritant), "was part of the initial group of rioters who overtook the police line," assaulted multiple Capitol Police officers with is hands, hit another officer with his gas mask, stole another police officer's shield and attacked him with it, and "raised a can of chemical irritant in the air, reaching around the officers' shields, and sprayed the officers directly in their faces."  According to the Department of Justice, Quaglin showed no remorse for his crimes and instead claimed to be a political prisoner, despite the fact that his assaults on multiple police officers were caught on camera.  *See* https://www.justice.gov/usao-dc/pr/new-jersey-man-sentenced-12-years-prison-assaulting-law-enforcement-and-other-charges        (last visited February 4, 2025).

38. Violent threats against FBI agents who have carried out lawful orders in relation to January 6th or subsequent investigations have been a consistent problem for the FBI for years.  For example, in 2022, agents who carried out the search of then-former-President Trump's home were doxed on Trump's social media network, which climaxed when an individual attempted a siege of the FBI field office in Ohio, resulting in his death.  Around the same time, a Pennsylvania man was arrested and charged with threatening to kill FBI agents.  The threat of retaliation by vigilantes was so profound that "the FBI issued a joint intelligence bulletin warning of an increase in threats, quietly hardened its facilities and **scrubbed personal information from websites** to protect personnel from possible danger." *See* Perry Stein et al., *As the FBI Comes Under Threat, its Leaders Try to Stay out of the Fray* (August 20, 2022) (emphasis added),

https://www.washingtonpost.com/national-security/2022/08/20/fbi-comes-under-threat-its-leader-tries-stay-out-view/ (last visited February 4, 2025).

39. Another pardoned January 6 felon, upon release from prison, threatened that his next actions would be "To regroup, go home and find out the nefarious actors in local homes and towns." Ryan J. Reilly and Gary Grumbach, *Relief, revenge but little repentance: Trump's pardons delight Jan. 6 offenders*, NBC News (Jan. 22, 2025), https://www.nbcnews.com/politics/donald-trump/relief-revenge-little-repentance-trumps-pardons-delight-jan-6-offender-rcna188798    (last visited February 4, 2025).

40. In addition to the above examples of January 6 rioters, individuals currently serving in senior executive branch officials in the current administration have regularly publicized the names of disfavored individual civil servants in an attempt to intimidate them. For example, White House Advisor Elon Musk of DOGE recently shared the names and titles of individual civil servants holding "relatively obscure climate-related government positions," generating a "barrage of negative attention" for those employees and leading at least one of them to delete their social media accounts. Hadas Gold and Rene Marsh, *Elon Musk publicized the names of government employees he wants to cut. It's terrifying federal workers*, CNN (Nov. 27, 2024), https://www.cnn.com/2024/11/27/business/elon-musk-government-employees-targets/index.html (last visited February 4, 2025).

**E. Recent Department of Justice Activity**

41. In the weeks since, the administration has summarily fired or forced into retirement law enforcement personnel involved in investigations and prosecutions arising out of the events of January 6, 2021.  On January 27, 2025, the administration fired more than a dozen prosecutors who worked on Special Counsel Jack Smith's team.  *See* Sarah N. Lynch and Andrew Goudsward,

*Trump's Justice Department launches sweeping cuts targeting Jan. 6 prosecutors, FBI agents*, Reuters (Jan. 31, 2025), https://www.reuters.com/world/us/fbi-launches-wide-ranging-round-cuts-sources-say-2025-01-31/ (last visited February 4, 2025).   On Friday, January 31, Acting Deputy Attorney General Emil Bove "told the top federal prosecutors in each state to compile a list of all prosecutors and FBI agents who worked on the investigation of the Capitol riot." *Id*. (emphasis added).  Bove did so by issuing a memo entitled "Terminations."

42. "That memo ordered eight FBI officials to resign or be fired, saying that their participation in the Jan. 6 cases represented part of what Trump has called the 'weaponization' of government," *id*., and identified at least some of the terminated officials. *See* Ken Dilanian, Tom Winter, Jonathan Dienst & Ryan J. Reilly, *Senior FBI official forcefully resisted Trump administration firings*, NBC News (Feb. 1, 2025), https://www.nbcnews.com/politics/national-security/senior-fbi-official-forcefully-resisted-trump-administration-firings-rcna190301 (last visited February 4, 2025).

43. Upon information and belief, supported by credible press reports, acting leadership at the Department of Justice has begun to take steps towards the mass, unlawful termination of Bureau employees who had any involvement in certain investigations related to President Trump, including Jan. 6 cases, and the lawful search of President Trump's residence at Mar-a-Lago. Adam Goldman at al., *Trump Officials Fire Jan. 6 Prosecutors and Plan Possible F.B.I. Purge*, N.Y. Times (Jan. 31, 2025); Evan Perez, et al., *Trump DOJ demands list of thousands of FBI agents, others who worked on Jan. 6 and Trump investigations for possible firing*, CNN (Jan 31, 2025), https://www.cnn.com/2025/01/31/politics/fbi-agents-who-investigated-january-6-fired       (last visited February 4, 2025).

44. Upon information and belief, as many as 6,000 FBI employees may currently be targeted

for unlawful firing. *See* Adam Goldman et al., *Top F.B.I. Agent in New York Vows to 'Dig In' After Removals at Agency*, N.Y. Times (Feb. 2, 2025) ("Mr. Trump's political appointees plan to purge career bureau officials, including rank-and-file field agents. That number could reach 6,000 — or about a sixth of the bureau's 38,000 employees, according to the F.B.I."), https://www.nytimes.com/2025/02/02/us/politics/fbi-new-york-email-trump.html (last visited Feb. 4, 2025).

45. In addition to being unlawful, a mass, unlawful firing of 6,000 FBI employees would be catastrophic to national security.

46. On Sunday, February 2, 2025, the Defendants ordered certain FBI agents to answer a questionnaire about their work on cases related to the events of January 6, 2021, to be completed by 3:00 p.m. the following date, February 3, 2025.  The survey was titled "A/DAG Memo Response: Events that Occurred at or Near the US Capitol on January 6, 2021."  The survey memo included the following questions (all marked "require I'md), each accompanied by a drop-down menu of available answers:

1. What is your current title?
2. Are you currently a supervisor?
3. Are you currently an ASAC or SSIA?
4. Are you currently an SES employee (e.g., SAC, Section Chief, DAD, AD, etc…)?
5. What was your title when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?
6. Were you a supervisor when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?
7. Were you an ASAC or SSIA when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?
8. Were you an SES employee when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?
9. What division are you currently in? (The drop down menu is sorted first

by Field Offices, Legat Offices, then HQ divisions, and then in alphabetical order by the division's 2-character code).

10. What division were you in when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?

11. What was your role in the investigation(s) or prosecution(s) relating to events that occurred at or near the US Capitol on January 6, 2021?[1]

12. What was the approximate date of your last activity relating to the investigation(s) or prosecution(s) relating to events that occurred at or near the US Capitol on January 6, 2021?

47. Strangely, the selection of FBI agents who received this information included many who did little to no work on January 6 investigations, while others who did work January 6 investigations did not receive a survey request.  On information and belief, Department of Justice is currently in a state of transitional disorganization and has been unable to confirm the accuracy of this basic informational data of its members.

48. On information and belief, the Defendants intend to publicly disseminate the names of those employees who responded to this survey, and/or those employees who the Defendants plan to demote, transfer and/or terminate based on this survey, and/or publicly disseminate employees' responses to the survey questions outlined above.

49. Such public disclosures would directly put the safety of all impacted individuals at risk as well as their family members.

**COUNT ONE: Violation of the Privacy Act, 5 U.S.C. § 552a(e)(6)**

50. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

---

[1] For this answer, a respondent can check from the following box options: [] Analytical support; [] Approved ECs or other documents in a case file; [] Arrest – led operation or participated in arrest; [] Assigned as case agent for investigation(s); [] Assigned as co-case agent for investigation(s); [] Conducted baseline database checks for case opening; [] Conducted surveillance of subject(s); [] Discovery; [] Evidence collection or disposition; [] Grand jury subpoena – submission or review; [] HQ Program Management Support; [] Interviewed witness(es), subject(s), and/or complainant(s); [] Responded to lead set [sic] by another office; [] Search warrant – led operation or participated in search; [] Supervised squad conducting investigation(s); [] Testified at trial; and [] Other (with a fillable space).

51. The Privacy Act requires that an agency, "prior to disseminating any record about an individual to any person other than an agency . . . make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." 5 U.S.C. § 552a(e)(6).

52. On information and belief, Defendants have disseminated or will imminently disseminate records about the Plaintiffs and their involvement in sensitive investigations.

53. On information and belief, Defendants have not made any reasonable efforts to ensure that the maintenance and public release of the records at issue in this case are accurate, complete, timely, and relevant for agency purposes.

54. Defendants' violation will cause substantial and irreparable harm to Plaintiffs. Defendants' anticipated intentional, willful, and unauthorized disclosure(s) of records pertaining to Plaintiffs will have demonstrable adverse effects on them. Among others, these effects include a risk to their safety and that of their family members, damage to their personal and professional reputations, harm to future employment opportunities and the ability to earn a living, and significant emotional distress.  This bell cannot be unrung, and once the Plaintiffs' personal information is released it will be eternally available on social media.

**COUNT TWO: Violation of the Privacy Act, 5 U.S.C. § 552a(b)**

55. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

56. Defendant Department of Justice is an "agency" within the meaning of the Privacy Act, *Whittle v. Moschella, et. al.*, 756 F. Supp. 589, 596 (D.D.C. 1991), and maintains one or several "system of records" as defined by 5 U.S.C. § 552a(a)(5). This/these system(s) of records contain(s) "records," as defined by 5 U.S.C. § 552a(a)(4) that pertain to and are about Plaintiffs, including their personally identifying information.

17

57. The disclosures of Plaintiffs' names based on their work on investigations and prosecutions arising out of the January 6, 2021 events came from FBI and/or DOJ sources. The information about Plaintiffs' case assignments is stored exclusively within FBI and/or DOJ systems of records.

58. 5 U.S.C. § 552a(b) provides that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the records pertains." No exception to this disclosure prohibition applies in this case. Upon information and belief, Defendants plan to willingly and intentionally disclose Plaintiffs' identifying information without their prior consent or approval, in violation of this provision.

59. Defendants' violation will cause substantial and irreparable harm to Plaintiffs. Defendants' anticipated intentional, willful, and unauthorized disclosure(s) of records pertaining to Plaintiffs have demonstrable adverse effects on them. Among others, these effects include a risk to their safety and that of their family members, damage to their personal and professional reputations, harm to future employment opportunities and the ability to earn a living, and significant emotional distress. Once the Plaintiffs' personal information is released it will be eternally available on social media.

**COUNT THREE: Violation of Administrative Procedure Act 5 U.S.C. § 706(2)**

60. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

61. Under the APA, a court shall "hold unlawful and set aside agency action found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . contrary to constitutional right, power, privilege, or immunity . . . without observance of procedure required

by law . . . [or] . . . unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706(2)(B).

62. Here, the Defendants' current and anticipated actions are contrary to the Defendants' right to privacy, their right to qualified immunity as law enforcement officers acting pursuant to lawful orders, and are in flagrant violation of well-established procedures for the safeguarding of personally identifiable information.

## COUNT FOUR: Mandamus under 28 U.S.C. § 1361

63. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

64. The provisions of 28 U.S.C. § 1361 provide a statutory basis for jurisdiction in cases seeking relief in the nature of mandamus against federal officers, employees, and agencies, and they provide for an independent cause of action in the absence of any other available remedies.

65. Defendants' actions, as set forth above, constitute unlawful, intimidating, and threatening behavior towards Plaintiffs in response to Plaintiffs' lawful actions of executing lawful search and arrest warrants and participating in lawful investigations of crimes committed by January 6 perpetrators.

66. Defendants do not have discretion to redefine the truth of January 6, 2021. Nor do Defendants have any discretion to recast the lawful actions taken by the FBI and the previous leaders within the Department of Justice as illegal, let alone any discretion to retaliate and disclose names.

67. Defendants have no discretion when it comes to ensuring the safety of the American people from extremist violence, let alone the safety of their own employees.

68. If no other remedy is available through which the unlawful termination orders may be

rescinded, then Plaintiffs are entitled to relief in the nature of mandamus compelling Defendants to recognize Plaintiff to rescind the unlawful termination orders.

## COUNT FIVE: First Amendment Violation for Retaliation
## Based on Perceived Political Affiliation

69. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

70. The First Amendment protects government employees from discrimination and adverse action based on a perception—even an incorrect one—about the employee's political beliefs, expression, or affiliation.

71. As set forth above, Defendants are subjecting Plaintiffs to imminent and irreparable risks of physical, reputational, and financial harm based solely on their perceived lack of political loyalty, in violation of their First Amendment freedoms. This retaliation is all the more outrageous given that it is based solely on their faithfully performing their job duties to investigate crimes and uphold the law.

## COUNT SIX: Due Process Violation (Reputational Harm)

72. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

73. Defendants' actions imminently violate Plaintiffs' substantive Due Process rights, which arises from their protected interest in their stellar reputations following distinguished yearslong careers at the FBI.

74. The Fifth Amendment protects against both "reputation plus" and "stigma plus" harm caused by government actors. Here, Defendants' actions harm Plaintiffs' interests beyond their reputations, with the loss of their present government employment and the intent to harm their future employment prospects. In addition, Defendants' actions have actually stigmatized

Plaintiffs' reputations by charging Plaintiffs and other similarly situated persons with dishonesty through allegations of improper political motivations in their faithful performance of their job duties to investigate crimes and uphold the law, which stigma hampers their future employment prospects.

75. As set forth above, Plaintiffs are being targeted for firing and public identification based on the false and defamatory premise that they abused their positions of authority for partisan reasons.

### COUNT SEVEN: Due Process Violation (Intentional Violation of Privacy Interests)

76. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

77. The Fifth Amendment requires the government to balance federal officers' constitutional privacy interests against the purported public interest in disclosure.

78. Defendants' disclosure of the identities of Plaintiffs and other similarly situated persons would cause irreparable harm to Plaintiffs by exposing them to the reasonable probability of violence. As set forth above, there are multiple indications on social media and other sources promoting violence and insurrection against law enforcement agents, including FBI agents such as Plaintiffs and other similarly situated persons. Plaintiffs therefore have a reasonable probability that the compelled disclosure of their identities will subject them to threats, harassment, or reprisals either from the government or private parties.

79. Plaintiffs' constitutional privacy interests outweigh any limited public interest in the compelled disclosure of their identities. Thus, Plaintiffs have a right to nondisclosure under the circumstances here.

## REQUEST FOR RELIEF

80. WHEREFORE, Plaintiff requests that this Court:

  a) Enjoin Defendants from any further collection or dissemination of personally identifiable information of Plaintiffs and other similarly situated persons;

  b) Issue writs of *mandamus* as appropriate;

  c) Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

  d) Award other relief as the Court deems just.


    Dated: February 4, 2025                                        Respectfully submitted,


*/s/ Mark S. Zaid*
Mark S. Zaid, D.C. Bar #440532
Bradley P. Moss, D.C. Bar #975905
Attorney for Plaintiffs John Doe 1-4 and Jane Doe 1-3
LAW OFFICE OF MARK S. ZAID, P.C.
1250 Connecticut Avenue, NW Suite 700
Washington, D.C. 20036
Tel: (202) 498-0011
Fax: (202) 330-5610
Mark@MarkZaid.com
Brad@MarkZaid.com


*/s/ Norman L. Eisen*
Norman L. Eisen, D.C. Bar #435051
Tianna J. Mays, D.C. Bar #90005882
Attorney for Plaintiffs John Doe 1-4 and Jane Doe 1-3
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Tianna@statedemocracydefenders.org

***For the Federal Bureau of Investigation Agents Association,***

/s/ *Christopher Mattei*
Christopher Mattei (Pro Hac Vice Pending)
Attorney for Plaintiff Federal Bureau of Investigation Agents Association
Federal Bar No. 27500
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
cmattei@koskoff.com

/s/ *Margaret M. Donovan*
Margaret M. Donovan (Pro Hac Vice Pending)
Attorney for Plaintiff Federal Bureau of Investigation Agents Association
Federal Bar No. 31787
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com